IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

ZACHARY L. BOWDISH,                    )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )        Case No. CIV-07-400-D
                                       )
FEDERAL EXPRESS CORPORATION,           )
                                       )
            Defendant.                 )


**O R D E R**

Before the Court is Defendant Federal Express Corporation's Motion for Summary Judgment [Doc. No. 51], which is fully briefed and at issue.[1] Based on the case record, the parties' arguments and the governing law, the Court finds that the Motion should be granted in part and denied in part as set forth below.

**Background**

Plaintiff Zachary L. Bowdish claims that Defendant wrongfully terminated his employment based on unfounded charges of misconduct. Specifically, Plaintiff alleges he was terminated because of his Caucasian race and male gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; because of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U. S. C. § 621 *et seq.*; and in retaliation for complaining of discrimination, in violation of Title VII and ADEA. Plaintiff also alleges he suffered racial and age-related harassment from his supervisor. Plaintiff brings supplemental state law claims alleging common law torts of negligent supervision, training and retention, and wrongful

---

[1] The parties have each filed multiple briefs and made supplemental submissions [Doc. Nos. 52, 56, 62, 65, 71, 74, 79, 81, 92, 93 and 96], all of which have been reviewed and considered.

discharge in violation of Oklahoma public policy, pursuant to *Burk v. K-Mart Corp.*, 770 P.2d 24 (Okla. 1989).

Defendant's Motion seeks summary judgment pursuant to Fed. R. Civ. P. 56 on the following claims and issues: 1) race discrimination, on the ground that Plaintiff cannot establish a *prima facie* case of reverse discrimination or pretext in his termination; 2) hostile work environment, on the ground that Plaintiff cannot establish severe or pervasive harassment; 3) age discrimination, on the ground that Plaintiff cannot establish a *prima facie* case; 4) gender discrimination, on the ground that Plaintiff cannot establish a *prima facie* case of reverse discrimination or pretext in his termination; 5) retaliation, on the ground that Plaintiff cannot establish a *prima facie* case of retaliation or pretext in his termination; 6) negligence, on the ground there is no evidence of a failure to supervise or train the managers responsible for Plaintiff's termination; and 7) punitive damages, on the ground there is insufficient evidence to support this type of damages.[2] The Court rules on these issues as follows.

## Standard of Decision

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id*. at 255. All facts and reasonable inferences must be

---

[2] Defendant's Motion does not specifically address Plaintiff's state law wrongful discharge claim, which was originally asserted regarding age discrimination and later amended to include race and gender discrimination in light of *Kruchowski v. Weyerhaeuser Co.*, 202 P.3d 144 (Okla. 2008). Defendant has taken the position that the public policy tort claim is coextensive with the federal claims and requires the same proof, so that summary judgment on the federal claims would entitle Defendant to a judgment on all claims.

viewed in the light most favorable to the nonmoving party. *Id.* If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex*, 477 U.S. at 322-23. If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); Fed. R. Civ. P. 56(e)(2). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. Although a district court has discretion to go beyond referenced portions of the supporting material, it is not required to do so. *Id.* at 672. The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

In addition to the requirements of Rule 56, local rules in this judicial district impose requirements on a party opposing a motion for summary judgment. *See* W.D. Okla. LCvR56.1. As pertinent here, a nonmovant's response brief must begin with "a concise statement of material facts to which the party asserts genuine issues of fact exist," and each fact in dispute "if applicable, shall state the number of the movant's facts that is disputed." *Id.* LCvR56.1(c). In this case, Plaintiff did not respond in a proper manner to Defendant's statement of facts. Plaintiff instead began his brief with his own statement of facts and then responded to each of Defendant's stated facts with a general or partial denial and a reference to various parts of Plaintiff's stated facts. This noncompliance with

LCvR56.1(c) has caused the Court to engage in a tedious process of ferreting out what material facts are truly in dispute under the existing record. In this instance, the Court has invested considerable time in examining Plaintiff's voluminous facts and supporting record, and comparing them to Defendant's voluminous facts and supporting record. In future cases, however, when the nonmoving party fails to adhere to the requirements of LCvR56.1, the Court may exercise its discretion under the rule to deem admitted for the purpose of summary judgment all material facts set forth in the movant's statement of facts.

## Statement of Undisputed Facts[3]

Plaintiff is a Caucasian male, formerly employed by Defendant. He was hired as a courier in 1986, promoted to the position of operations manager in 2000, and terminated from this position in 2006. As an operations manager, Plaintiff supervised trucking operations and workers, including ramp transport drivers, or RTD's, at the Oklahoma City airport ramp (OKC-R). Beginning in 2004, Plaintiff's direct supervisor was a senior manager named Teresa Williams, an African American female, who was responsible for OKC-R and the Tulsa airport ramp. Between January, 2004, and June, 2006, operations managers reporting to Williams included Plaintiff, Carlton Futrell, Penny Martin, Tony Rodriguez, Octavio Garcia, and Todd Brooks – all males except Martin, and all Caucasian or Hispanic.[4] During 2005 and 2006, Williams reported to a managing director named Thomas Beaury, a Caucasian male, who was responsible for seven locations in Oklahoma and Texas

---

[3] This statement includes facts presented by Defendant that are supported by the record and either admitted by Plaintiff or not opposed in the manner required by Rule 56, as well as additional facts presented by Plaintiff that are supported by the record. Facts or factual issues raised by Plaintiff without citation to the record, or by citation to evidentiary materials that do not support the alleged fact or issue, are disregarded. Immaterial facts are also disregarded. All facts are stated in the light most favorable to Plaintiff.

[4] Williams terminated Martin's employment in October, 2005. Garcia moved from Tulsa to Texas in January, 2006, and Brooks moved from OKC-R to Tulsa, leaving only Futrell and Plaintiff at OKC-R.

and ten senior managers. The person responsible for human resources at OKC-R and Tulsa was Robert Young, a Caucasian male. Plaintiff's employment was terminated on June 8, 2006, when he was 44 years old. At that time, the ages of Williams, Young, and Beaury were 42, 43, and 48, respectively.

Plaintiff hired Steven Parker as an RTD in February, 2003, and supervised Parker throughout his employment, as did other operations managers. On several occasions during 2003 and 2004, Plaintiff counseled Parker about proper time card and clock-in procedures. Time cards are very important in Defendant's operations, and managers are required to audit their employees' time records to ensure accuracy and correct payment. Managers verify employees' time cards by reviewing a computer-generated report in the company's Field Activity Management Information System (FAMIS). This report is a daily time card review report that allows managers to monitor the distribution of hours spent on the road and at the ramp location, and to audit schedules and employees' start times, hours, and breaks. Each hourly employee has a scheduled start time, which is the time an employee should be ready to work. During the relevant time period, Plaintiff was responsible for preparing RTD's schedules on a monthly basis and posting them on bulletin boards at OKC-R. However, these schedules were subject to change to accommodate business needs, particularly during peak times like the Christmas season. As operations manager, Plaintiff's job duties included verifying employees' time card entries and reviewing FAMIS reports containing information about employees' activities, start/end times, and hours. Plaintiff received time cards and FAMIS reports on a daily basis to enable him to determine the accuracy of time cards and any discrepancies with FAMIS reports.

During 2005 and 2006, Parker's scheduled start time was 2:00 a.m., as set and posted by Plaintiff. Parker generally departed OKC-R on his route at 4:00 a.m. and returned between 9:30 a.m. and 10:00 a.m. On February 20, 2006, several employees reported to Futrell, the operations manager on the morning shift, that Parker arrived to work at 3:04 a.m. but recorded his start time as 2:00 a.m.[5] Plaintiff learned of the alleged falsification the same day, and he and Futrell informed Williams. Plaintiff began investigating the issue by viewing security videotape and collecting statements. Williams also commenced an investigation in which she involved Young. Young assisted in conducting interviews and collecting information, but Williams "headed up" the investigation. *See* Young Dep. 78:2-78:3. Williams' investigation concerned both Parker's alleged falsification and Plaintiff's supervision of Parker. Williams asked Plaintiff to obtain statements from employees under his supervision, and Plaintiff reported to her on February 23, 2006, that the statements confirmed the falsification. Williams also interviewed Parker and asked him for a statement regarding the events on February 20, 2006. Parker admitted the alleged falsification, and a security camera clocked him arriving to work at 3:04 a.m. while his time card reflected a start time of 2:00 a.m. Parker was suspended on February 23, 2006, after the falsification was verified.

During the investigation, Williams also reviewed Parker's time cards from November, 2005, through January, 2006, and reviewed employee schedules prepared by Plaintiff, various time reports (including FAMIS daily reports), and employee electronic calendars for Parker and Plaintiff's entire work group. Parker told Williams and Young that nearly every day "for months" he claimed to start work at 2:00 a.m. but actually slept in his truck between 2:00 a.m. and 4:00 a.m. Parker said that

---

[5] Futrell worked a morning shift from approximately 4:00 a.m. to 12:00 noon. Plaintiff worked a day shift of 7:00 a.m. to 3:00 p.m. Beginning in January, 2006, when Brooks moved to Tulsa, Williams also assigned Plaintiff to work Brooks' evening shift of 4:00 p.m. to 12:00 midnight.

he arrived at work around 10:30 p.m., performed work not reflected on his time card, and then went to sleep, and that Plaintiff instructed him to record the sleeping time as work hours, counting it in place of what he had done the prior evening. In his testimony, Plaintiff has denied knowing about Parker's sleeping arrangement at the time, and Parker equivocated in his testimony, testifying that he "thought" Plaintiff knew. *See* Parker Dep. 30:3-16. Plaintiff points out that he was not assigned to the early morning shift and he first became responsible for the evening shift in January, 2006, when he was assigned to cover two shifts. *See supra* note 5. Also, while two employees had previously reported to Plaintiff that they had seen Parker sleeping in his truck, Plaintiff states he was unable to confirm this report. Williams and Young concluded that Plaintiff knew of Parker's time card falsification based on discrepancies between scheduled start times and Parker's time cards. However, Plaintiff disputes the basis of this conclusion.

Plaintiff was suspended on March 2, 2006. He received a suspension letter stating he was "being placed on paid suspension pending investigation of potential violation of the Acceptable Conduct Policy." *See* Pl.'s Ex. 9 [Doc. No. 56-10]. Plaintiff denies that he was informed of the reason for his investigatory suspension. During the suspension, Williams proceeded to investigate additional allegations of misconduct, including that Plaintiff had falsified Parker's time card and that Plaintiff's management style included "bullying" subordinate employees. Young was not involved in this part of the investigation but was informed about these issues by Williams; Young later concurred in the termination of Plaintiff's employment based on the information that Williams supplied. *See* Young Dep. 126:13-127:18. Beaury received information about Plaintiff from Williams, Young and Jeff Werner, discussed below; Beaury did not speak with Plaintiff about the allegations before his termination. *See* Beaury Dep. 107:1-110:7, 133:9-17; 147:18-148:5. The

information included findings that Plaintiff had falsified Parker's time card by altering the hours worked and by making the change without having Parker initial the altered time card. The parties disagree about the company's policy in this regard. Plaintiff maintains that time cards frequently needed to be corrected or modified to reflect hours actually worked, as opposed to times at which employees clocked in without starting work or forgot to clock out when taking a break, and that employees were not required to initial every change. Plaintiff has testified he made a change to Parker's time card to account for a situation where Parker worked twice in one day but recorded it on different time cards.[6] Plaintiff alleges that he made the change after consulting a regional manager, Bob Concannon, about the situation. Concannon could not recall a conversation with Plaintiff on this issue.

Shortly after his suspension, Plaintiff filed an internal EEO complaint, which was investigated by Werner, an employee in Defendant's HR department. Although Plaintiff questions the thoroughness of the investigation, it concluded with a determination by Beaury on May 26, 2006, that no discrimination or retaliation had occurred, only that "some practices that may be inconsistent with our policies, culture and philosophy" had been identified and addressed. *See* Pl.'s Ex. 17 [Doc. 56-18]. Before making a formal complaint, Plaintiff had spoken with Young by telephone about alleged discrimination and race-based conduct by Williams. Plaintiff complained about receiving a heavier work assignment in January, 2006, allegedly because he was "older",[7] about a comment made by Williams during a staff meeting in January, 2006, regarding Plaintiff's bringing out "the angry black woman" in her, and about Williams' scrutiny of Plaintiff's discipline of African

---

[6] Defendant challenges this testimony, and other statements by Plaintiff, as inconsistent with other testimony and evidence. However, credibility issues cannot be resolved under Rule 56.

[7] *See supra* note 5.

8

American employees. These concerns were part of the EEO investigation and were not investigated by Young, although Young may earlier have mentioned some of Plaintiff's concerns to Beaury. The only item addressed as a result of the EEO investigation is that Beaury counseled Williams about the "angry black woman" comment. Williams knew of the EEO investigation and was generally aware of Plaintiff's complaint against her.

Plaintiff's termination was announced by a June 8, 2006, memorandum from Williams to Plaintiff stating several reasons, including "Gross Leadership Failure, intimidating and displaying public disrespect of employees while on duty." *See* Pl.'s Ex. 8 [Doc. No. 56-9]. The memorandum explained that Plaintiff had "failed to investigate allegations of falsification" and "failed to document or hold this employee accountable for a schedule, punctuality, start time or an assigned task." *See id.* Also, Plaintiff allegedly "verified weekly that [he] had monitored all timecards, when in fact there [was] no indication that [he] had." *See id*. The memorandum further stated:

> It was also determined that you falsified company documents. On February 21, 2006, you changed an employee's timecard via the FAMIS system. This change resulted in the employee receiving nine hours and thirty-five [sic] of compensation for February 20, 2006, instead of the eight hours he had worked and coded on his timecard. You made this change without the employee['s] signature. In addition, you ended his timecard while he was still on the road to avoid a potential Hours of Service Violation.

> The investigation also revealed that over the course of at least the last two years, you have fostered and [sic] environment of intimidation and public disrespect of employees. Employees have been belittled in front of other employees and intimidated by your practices.

*Id*. Despite Williams' memorandum, Beaury testified he made the decision to terminate Plaintiff's employment based primarily on two items – Plaintiff's failure to address Parker's falsification of time cards and Plaintiff's falsification of Parker's time card. *See* Beaury Dep. 186:22-187:19. Any other deficiencies could have been corrected. *See* Beaury Dep. 224:14-22.

During Plaintiff's employment, including his tenure as an operations manager, he received positive performance evaluations and awards. His last annual review in 2005 resulted in an overall rating of 3.8 on a 4.0 scale. Plaintiff received a perfect score of 4.0 in the categories of leadership and employee direction, motivation, and communication.

Prior to Plaintiff's suspension, Williams interviewed Keith Neals, an African American male, for a position of operations manager at OKC-R. Although several employees applied for the promotion, Neals was the only African American applicant. According to Plaintiff, Williams had previously commented to him that the next OKC-R operations manager needed to be African American. In an affidavit, Neals has stated that Williams offered him the position in February, 2006, and told him he would be taking over responsibility for RTD's (then assigned to Plaintiff).[8] Neals began work as an operations manager after Plaintiff's suspension in March, 2006. Neals continued in that position until May, 2007, when he was terminated by another senior manager who had succeeded Williams.

Plaintiff also presents facts to show that Williams had previously engaged in misconduct in violation of company policy that was investigated and, in part, confirmed. In September, 2005, Young interviewed operations managers and staff concerning allegations of "mistrust" of Williams. The investigation revealed that Williams had converted a company cell phone to her personal use and that Defendant had paid phone charges incurred by her teenage son. Williams received only a warning letter for this violation of the company's "Acceptable Conduct Policy," for what was deemed by Beaury to be "poor judgment" on her part. *See* Def.'s Reply Br., Ex. C [Doc. 62-2].

---

[8] Neals was also told he would be assigned the evening shift, vacated by Brooks when he transferred to Tulsa in January, 2006, but then assigned to Plaintiff.

Additional allegations that Williams had required support staff to do her personal errands while "on the clock" were not confirmed, although Plaintiff contends Young's investigation was superficial and omitted evidence that was readily available, such as employees' time cards. No allegation of discrimination was made against Williams at that time.

## Discussion

I.      **Title VII - Race and Gender Discrimination**

A.      **Reverse Discrimination**

While Title VII prohibits all discrimination on the basis of race or gender, case law requires a modified approach to a claim asserted by a member of a majority group where, as here, a plaintiff lacks direct evidence of discrimination and relies on the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under the traditional analysis, the first element of a *prima facie* case requires proof that the plaintiff is a member of a protected class. *See McDonnell Douglas*, 411 U.S. at 802. However, "the presumptions in Title VII analysis that are valid when a plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group." *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992) (internal quotation omitted). Thus, "a Title VII disparate treatment plaintiff who pursues a reverse discrimination claim, and seeks to obtain the benefit of the *McDonnell Douglas* presumption, must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Notari*, 971 F.2d at 589.[9] Such background circumstances may

---

[9]  Since first adopting this formulation in *Notari*, the Tenth Circuit has repeatedly reaffirmed its validity and imposed "heightened standards" for a *prima facie* case of reverse discrimination. *See Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1149 (10th Cir. 2008); *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006); *Mattioda v. White*, 323 F.3d 1288, 1292-93

be shown by statistical evidence, for example, that the plaintiff's position or department was dominated by a minority group. *See Reynolds v. School Dist. No. 1*, 69 F.3d 1523, 1535 (10th Cir. 1995). It is insufficient, however, simply to show that the decision maker was a member of a minority group. *See Notari*, 971 F.2d at 589; *Taken v. Oklahoma Corp. Comm'n*, 934 F. Supp. 1294, 1298 (W.D. Okla. 1996), *aff'd*, 125 F.3d 1366 (10th Cir. 1997).[10]

In this case, Plaintiff asserts that his reverse race and gender discrimination claims are supported by background circumstances showing that Defendant favors minority groups. To make this showing, Plaintiff presents facts and evidence to establish the following circumstances: that Defendant compiles and maintains statistical records concerning the race, ethnicity, and gender of its employees; that Defendant has adopted an affirmative action plan to guide hiring and promotion decisions;[11] that Defendant assesses the performance of, and offers financial incentives to, managers based on the diversity of the workforce under their supervision; that Defendant employs a

_____

(10th Cir. 2003) (holding *Notari* was unaffected by intervening Supreme Court decisions). In a supplemental brief filed on August 13, 2009 [Doc. 96], Plaintiff argues that *Notari* has been overcome by *Ricci v. DeStefano*, 129 S. Ct. 2658 (2009). However, *Ricci* involved direct evidence of discrimination and did not impact the *McDonnell Douglas* framework. *See Ricci*, 129 S. Ct. at 2673 (noting "express, race-based decision making" in the challenged decision not to certify test results that would result in the promotion of too few minority candidates for firefighter positions). Thus, the rule of *stare decisis* requires this Court to follow *Notari*. *See Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1130 (10th Cir. 2009) (published decision by panel of the court of appeals is binding precedent, unless overcome by an *en banc* decision or a decision of the Supreme Court).

[10] Absent proof of such background circumstances, the *McDonnell Douglas* presumption may also be triggered by an alternative means of proof that requires "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged decision would have favored the plaintiff." *Notari*, 971 F.2d at 590. In this case, Plaintiff relies only on the "background circumstances" method of proof, even though he cites a "direct evidence" case, *McGarry v. Board of County Comm'rs*, 175 F.3d 1193, 1199 (10th Cir. 1999).

[11] In a case involving a hiring or promotion decision, evidence that Defendant followed its affirmative action plan in taking the challenged employment action might constitute direct evidence of discrimination. *See McGarry*, 175 F.3d at 1199-1200; *see also Humphries v. Pulaski County Special Sch. Dist.*, 580 F.3d 688 (8th Cir. 2009).

disproportionate percentage of minorities in comparison to the overall population; that Defendant has received recognition for its diverse workforce and the success of its minority executives; that Defendant supports charitable organizations promoting minority causes; that Williams, a female manager of a minority race, played an active role in (or allegedly made) the decision to terminate his employment; and that Williams' stated agenda was to increase diversity in the position occupied by Plaintiff.

Defendant vigorously challenges the accuracy of Plaintiff's stated facts and the credibility of his evidence, and denies any intent to discriminate against majority groups. Defendant contends it must track demographics of its workforce and implement an affirmative action plan as a contractor of the federal government. Nevertheless, accepting Plaintiff's evidence as true for summary judgment purposes, and viewing the facts in the light most favorable to Plaintiff, as required by Rule 56, the Court finds that Plaintiff has made a sufficient showing to satisfy the first element of his *prima facie* case of race and gender discrimination under the modified *McDonnell Douglas* test. Accordingly, the Court proceeds to consider the remaining elements of Plaintiff's *prima facie* case.

### B.  *Prima Facie* Case

The remaining elements of Plaintiff's *prima facie* case of race or gender discrimination are: that he was performing his job satisfactorily; and that he was terminated under circumstances giving rise to an inference of discrimination. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004); *see also E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). Defendant asserts that Plaintiff cannot satisfy either of these prongs due to Defendant's evidence that Plaintiff was terminated for unsatisfactory performance and misconduct connected to his job. In response, Plaintiff argues that his performance record plainly shows he had the skills to perform, and had

successfully performed for several years, the requirements of his position. Plaintiff also argues that an inference of discrimination arises from the following circumstances allegedly shown by the facts and evidence: a disparity between the discipline he and Williams received for equally serious misconduct; Williams had demonstrated racial bias; and Williams conducted a biased investigation and caused his termination, which was only nominally decided by Beaury. Plaintiff has also taken the position that he was replaced by Neals, an African American.

### 1. Satisfactory Job Performance

Defendant's contention that Plaintiff cannot establish satisfactory job performance because he was terminated for misconduct conflates the second element of Plaintiff's *prima facie* case with the question of pretext, and is contrary to binding precedent. The court of appeals has held that an employer cannot defeat a plaintiff's *prima facie* case "by asserting that the plaintiff failed to satisfy subjective qualifications" or "by articulating the reasons for the adverse employment action because the plaintiff in such a situation would be denied the opportunity to show that the reasons advanced by the defendant were pretextual." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192-93 (10th Cir. 2000) (citing *Burrus v. United Tel. Co.*, 683 F.2d 339, 342 (10th Cir. 1982), and *MacDonald v. Eastern Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1119-20 (10th Cir. 2000)). Such qualifications "are more properly considered at the second stage of the *McDonnell Douglas* analysis." *Id.* at 1194. According to the court of appeals:

> [A] plaintiff may meet the second element of a "*prima facie* case of discrimination in a discharge case by credible evidence that [he] continued to possess the objective qualifications [he] held when [he] was hired, or by [his] own testimony that [his] work was satisfactory, even when disputed by [his] employer, or by evidence that [he] had held [his] position for a significant period of time."

*See Bolton v. Sprint/United Management Co.*, 220 F. App'x 761, 766-67 (10th Cir. 2007)[12] (quoting *MacDonald*, 941 F.2d at 1121); *accord Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992); *see also English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1008 (10th Cir. 2001) ("the extensive period of time that [plaintiff] held his position at least entitles him to an inference of satisfactory performance sufficient to survive summary judgment").

In this case, Defendant does not dispute that Plaintiff was qualified for the position of operations manager and had satisfactorily performed the requirements of the position for more than five years before the events leading to his discharge. Defendant's evidence that Plaintiff's performance was unsatisfactory for other reasons may not be considered with regard to the second element of Plaintiff's *prima facie* burden but, instead, must be evaluated in connection with his claim of pretext. Accordingly, the Court finds that Plaintiff has satisfied the second element of his *prima facie* case for purposes of Defendant's summary judgment motion.

### 2. Inference of Discrimination

Whether Plaintiff can demonstrate circumstances to support an inference of discrimination must be examined separately with respect to the two types of discrimination alleged under Title VII: race discrimination and gender discrimination. This final element of a *prima facie* case is a flexible one. The court of appeals has observed:

> Courts have enumerated a variety of circumstances that can give rise to an inference of discriminatory motive, including:
>
> > actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus . . . , preferential treatment given to employees outside the protected class . . . , in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees

---

[12] Unpublished opinion cited pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1(A).

> . . . , or a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified] and failure to surface plaintiff's name for positions for which she is well-qualified. A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, . . . or, more generally, upon the timing or sequence of events leading to plaintiff's termination.

*Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quoting *Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir.1996)).

### a.    Race Discrimination

To generate an inference that the termination decision was racially motivated, Plaintiff relies on Williams' alleged responsibility for his termination, Williams' alleged race-based conduct and comments, and her alleged receipt of lighter discipline for similar conduct. *See* Pl.'s Resp. Br. [Doc. 56] at 29-30.

An inference of discrimination may arise from disparate discipline of individuals who are "similarly situated." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800-01 (10th Cir. 2007). "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *Id.* at 801. In this case, Plaintiff argues that Williams merely received a warning letter for theft of company property and counseling for an inappropriate racial remark, while he was terminated for similar offenses – not catching a cheating employee, making an improper change of a time card, and bullying employees. The Court is not convinced that Plaintiff and Williams are similarly situated, even though Beaury made the disciplinary decisions concerning both and even though both were found to have violated the "Acceptable Conduct Policy." Williams was Plaintiff's supervisor and a senior manager who reported directly to Beaury; Plaintiff has not shown that he and Williams were subject to the same standards of performance and discipline. More

importantly, it is undisputed that hourly employees' time cards are very important in Defendant's business and that ensuring the accuracy of employees' time records is one of a manager's job duties. The Court is unconvinced that a violation involving inaccurate or altered time cards is comparable in seriousness to a violation involving misuse and loss of a cell phone or an inappropriate remark. Therefore, the Court does not find that the alleged circumstance of disparate discipline between Plaintiff and Williams creates an inference of racial discrimination.

On the other hand, the Court finds that Plaintiff has presented sufficient facts and evidence to create a reasonable inference of racial bias in the termination decision. Although Defendant has consistently maintained that Beaury made the final decision to terminate Plaintiff's employment, this fact is not dispositive. The court of appeals has endorsed a subordinate bias theory of liability, under which a racially biased investigator may issue reports and recommendations that cause a decision maker who relies on those reports to make a discriminatory employment decision. *See E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 487 (10th Cir. 2006), *cert. dismissed*, 549 U.S. 1334 (2007); *see also Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006). Plaintiff has identified sufficient facts and evidence to suggest that Williams controlled the investigation and supplied critical information on which the termination decision was based. The evidence, when viewed most favorably to Plaintiff, would permit a reasonable inference that Williams may have caused Plaintiff's termination. Further, Plaintiff has presented some evidence of racial bias by Williams, specifically with regard to the position of operations manager, that might permit an inference of a racially motivated investigation and recommendation for termination. An inference of discriminatory motive may arise from discriminatory statements directed at the plaintiff's position. *See Young*, 468 F.3d at 1252; *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir.

1994).  Finally, the facts could also be read to suggest that Plaintiff's job responsibilities were assumed to some extent by a minority employee, Neals.

The Court acknowledges Defendant's position that Williams' investigation and findings had a legitimate basis and that Plaintiff's misconduct warranted termination.  However, because Defendant relies on the same alleged performance issues both to defeat Plaintiff's *prima facie* case and to establish a legitimate, nondiscriminatory reason for Plaintiff' s termination, these issues are more properly considered in determining whether Plaintiff can prove that Defendant's reasons for his termination were pretextual.  At this point in the analysis, the Court simply finds that Plaintiff has established a *prima facie* case of racial discrimination for purposes of Defendant's summary judgment motion.

### b.    Gender Discrimination

The Court does not reach the same conclusion with respect to Plaintiff's claim of gender discrimination.   The only circumstance identified in Plaintiff's brief as creating an inference of gender discrimination in the termination decision is "the disparity in treatment between Williams and [Plaintiff]."   *See* Pl.'s Resp. Br. [Doc. 56] at 33.  This argument presumably refers to the purported disparate discipline of allegedly similarly-situated employees, discussed above.  For the reasons set forth above, the Court finds that no inference of discrimination arises from the difference in disciplinary measures taken against Williams and Plaintiff.  Therefore, the Court finds that Plaintiff has failed to come forward with sufficient facts and evidence to satisfy the final element of a *prima facie* case of gender discrimination.

Because Plaintiff has failed to establish a *prima facie* case of gender discrimination in his termination, Defendant is entitled to a judgment as a matter of law on this claim.  Therefore,

Defendant's motion for summary judgment on Plaintiff's Title VII claim of gender discrimination will be granted.

### C.    Pretext

If a plaintiff claiming reverse discrimination establishes a *prima facie* case under the formulation approved in *Notari*, then the remainder of the *McDonnell Douglas* paradigm applies. *Notari*, 971 F.2d at 591. Under this analysis, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action, and if it does so, the plaintiff then has the burden of proving that such reason is pretextual. *See McDonnell Douglas,* 411 U.S. at 802-04; *Young v. Dillon Co.*, 468 F. 3d 1243, 1250 (10th Cir. 2006).

In this case, Defendant plainly has satisfied its burden of production. The undisputed facts show that Plaintiff's termination was the result of a multi-faceted investigation over a three-month period. Defendant has presented evidence to show that Beaury decided to terminate Plaintiff based on his misconduct in altering or "falsifying" Parker's time card, his failure to detect Parker's false time card entries and irregular work schedule, and Plaintiff's purported abrasive management style. Thus, the burden shifts to Plaintiff to identify sufficient facts and evidence to establish that these proffered reasons for his termination were a pretext for racial discrimination.

A plaintiff demonstrates pretext by showing either "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Texas Dep't Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Under the latter approach:

> A plaintiff demonstrates pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951-52

(3d Cir. 1996)).  Evidence of pretext may include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria."  *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (quoting *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999)).

*Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).  A plaintiff can make a showing of pretext with evidence that the defendant's stated reason for the termination was false. *Bryant v. Farmers Ins. Exchange*, 432 F. 3d 1114, 1125 (10th Cir. 2005).  However, "the relevant 'falsity' inquiry is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue."  *Young*, 468 F.3d at 1250.

In this case, Plaintiff argues there are sufficient disputed, material facts to preclude summary judgment on this issue.  Plaintiff contends Defendant's reasons for his termination are suspect because the stated reasons have changed, because the charge of "falsifying" Parker's time card was unfounded and based on an inaccurate statement of company policy regarding time card changes, and because the termination decision was not compelled by any disciplinary policy but was a subjective decision caused by Williams' racial bias.  In arguing that Defendant has given inconsistent reasons for his termination, Plaintiff refers to Beaury's testimony that his decision to approve Plaintiff's termination was not based on all the reasons stated in Williams' termination memo and presented in Defendant's summary judgment brief.

After careful consideration, the Court finds that Plaintiff has identified sufficient facts and evidence, although barely, to demonstrate a genuine dispute of material facts regarding the issue of pretext.  Although record evidence supports Defendant's contention that Plaintiff's misconduct and management failure were the reasons for his termination, Plaintiff has demonstrated sufficient weaknesses and inconsistencies in Defendant's reasons from which a reasonable jury could possibly

find that those reasons are not credible. Further, Plaintiff has presented evidence to show that Williams led the investigation concerning time card issues and alone conducted the investigation that led to the most-damning conclusion – that Plaintiff "falsified" Parker's time card. This evidence is contrary to Defendant's contention that Williams discontinued her investigation after Plaintiff filed an EEO complaint. *See* Def.'s Mot. Summ. J. [Doc. 52] at 3, ¶ 12. The record reflects that Young's information on this issue and the issue of Plaintiff's bullying employees came solely from Williams and that Beaury got his information from Williams and Young.[13] Finally, as stated above, Plaintiff has presented evidence of racial bias by Williams that is potentially connected to the employment position at issue. "While isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions, a plaintiff can show such animus by demonstrating a nexus between the allegedly discriminatory statements and the defendant's decision to terminate the plaintiff." *Minshall v. McGraw Hill Broadcasting Co*., 323 F.3d 1273, 1281 (10th Cir. 2003) (internal quotation omitted). "A causal nexus can be shown if the allegedly discriminatory comments were directed at the plaintiff [or] her position." *Rea v. Martin Marietta Corp*., 29 F.3d 1450, 1457 (10th Cir.1994). Plaintiff has related comments by Williams that she wanted an African American operations manager, and has presented evidence that Plaintiff was replaced, to some extent, by an African American.

In short, the Court finds that Plaintiff has come forward with sufficient facts and evidence that, viewed most favorably to him as required by Rule 56, demonstrate a triable issue of pretext.

---

[13] Beaury testified he also received input from Werner, but there is no evidence Werner investigated anything other than Plaintiff's allegations against Williams.

Therefore, Defendant is not entitled to summary judgment on Plaintiff's claim under Title VII that his termination was motivated by racial discrimination.

## II.    ADEA - Age Discrimination

The ADEA makes it unlawful for an employer to discriminate against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U. S. C. § 623(a)(1).  When assessing the burden of proof in ADEA claims, the court of appeals has consistently applied the *McDonnell Douglas* burden-shifting analysis applicable to Title VII claims.  *See, e.g., Riggs v. AirTran Airways, Inc.*, 497 F. 3d 1108, 1114-15 (10th Cir. 2007).  However, the Supreme Court recently rejected the argument that an ADEA claimant can satisfy his burden of proof by showing that age was a motivating factor in his termination, and expressly held that a plaintiff must prove that "age was the 'but-for' cause of the challenged adverse employment action."  *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2352 (2009).

In *Gross*, the Court did not discuss the effect of its holding on the *McDonnell Douglas* burden-shifting analysis in an ADEA case, but observed in a footnote that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . utilized in Title VII cases is appropriate in the ADEA context."  *Gross*, 129 S. Ct. at 2349 n. 2.  Research leads the Court to conclude, however, that *Gross* does not preclude the application of the *McDonnell Douglas* analysis in ADEA cases.  Although the Tenth Circuit has not decided whether *McDonnell Douglas* still applies in cases based on circumstantial evidence of age discrimination, it has continued to apply *McDonnell Douglas* after *Gross* in unpublished decisions.  *See Reeder v. Wasatch County Sch. Dist.*, No. 08-4048, 2009 WL 5031335, *3 (10th Cir. Dec. 23, 2009); *see also Woods v. Boeing Co.*,

No. 07-3358, 2009 WL 4609678, *5 (10th Cir. Dec. 8, 2009) (Anderson, J., concurring) (noting criticism of *McDonnell Douglas* in ADEA cases, acknowledging *Gross*, but concluding that "*McDonnell* still applies in ADEA cases in this circuit").  Other federal appellate courts have also held that *McDonnell Douglas* remains applicable to such claims.  *See Geiger v. Tower Automotive*, 579 F. 3d 614, 622 (6th Cir. 2009); *see also Gorzynski v. Jetblue Airways Corp*., 2010 WL 569367 (2d Cir. Feb. 19, 2010) (to be published).  Having reviewed these decisions, the Court agrees that, notwithstanding *Gross*, the *McDonnell Douglas* burden shifting analysis remains applicable to an ADEA claim based on circumstantial evidence.  Accordingly, the Court will apply that analysis to Defendant's summary judgment motion.

### A. *Prima Facie* Case

Defendant contends Plaintiff cannot establish a *prima facie* case of age discrimination for the same reasons discussed above, that is, he was not doing satisfactory work and there is no inference of age discrimination in his termination.

For reasons stated above, the Court finds that Plaintiff has made a *prima facie* showing of satisfactory work performance; an assessment of Defendant's allegations of misconduct must be reserved for a later stage of the analysis regarding pretext.  Likewise, for reasons similar to those discussed above regarding race discrimination, the Court finds Plaintiff has presented sufficient facts and evidence to raise an inference of age discrimination in his termination.  In addition to showing Williams' alleged influence over the termination decision, Plaintiff has testified that Williams made ageist comments specifically directed at him, such as calling him "old timer."  *See* Bowdish Dep. 52:2-18.  Further, there is evidence to suggest Plaintiff was replaced, at least in part, by a younger

person, which is sufficient to establish the final element of his *prima facie* case. *See Rivera v. City of Denver*, 365 F. 3d 912, 920 (10th Cir. 2004).

Therefore, the Court concludes that Plaintiff has satisfied his burden to establish a *prima facie* case of age discrimination for purposes of Defendant's summary judgment motion.

## B.    Pretext

Having previously determined that Defendant has met its burden to articulate legitimate, nondiscriminatory reasons for the decision to terminate Plaintiff's employment, the burden shifts to Plaintiff to demonstrate the proffered reasons for his termination were a pretext for age discrimination.

After careful consideration of Plaintiff's alleged facts and evidence, the Court reaches the same conclusion, discussed above, that Plaintiff has demonstrated a genuine issue of pretext with regard to his claim of age discrimination. In addition to circumstances that may draw into doubt Defendant's stated reasons for Plaintiff's termination, and circumstances that would support a reasonable finding that Williams caused the termination decision, Plaintiff has come forward with facts and evidence that might suggest age-related bias by Williams. Plaintiff has related ageist statements by Williams directed at him. He has also presented evidence that Williams previously made an allegedly age-based assignment of work duties to him, which suggests age-related bias in Williams' decisions regarding Plaintiff. Defendant argues that age discrimination cannot be inferred because the decision makers were close in age to Plaintiff and members of the protected class. However, this argument overstates the cited decisions, which found it "significant" but "not dispositive" that individuals alleged to have engaged in age discrimination were themselves

members of the protected class.  *See*, *e.g.*, *Richter v. Hook-SuperRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998).

In summary, the Court concludes that the record reflects a genuine dispute of material facts regarding the issue of pretext in connection with Plaintiff's claim of age discrimination.  Of course, this conclusion does not relieve Plaintiff of the burden to prove at trial, as required by *Gross*, that he would not have been terminated "but for" age discrimination.  However, Plaintiff's present showing is sufficient to preclude summary judgment on the issue of pretext.  Therefore, the Court finds that Defendant is not entitled to summary judgment on Plaintiff's age discrimination claim.

## III.    Retaliation

As with his discrimination claims, Plaintiff relies on circumstantial evidence to prove his claim of retaliatory termination, and the *McDonnell Douglas* framework applies.  *See Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008).

### A.    *Prima Facie* Case

Defendant challenges Plaintiff's ability to satisfy two elements of a *prima facie* case of retaliatory termination:  (1) he engaged in statutorily protected activity;[14] and (2) there was a causal link between the protected activity and an adverse action.  *See id*.; *Argo v. Blue Cross & Blue Shield of Kansas, Inc*., 452 F.3d 1193, 1202 (10th Cir. 2006).  A close temporal proximity between the protected activity and the adverse action alone may establish a causal link.  *See O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999).  However, "if the only evidence of causation is a temporal relationship, then

---

[14] Title VII's protection from retaliation is two-fold; the statute contains a participation clause, which protects an employee who makes a charge or participates in a proceeding, and an opposition clause, which protects an employee who opposes an unlawful practice.  *See* 42 U.S.C. § 2000e-3(a).  The distinction is immaterial here.

the adverse action must occur closely following the protected activity. For example, an adverse employment action that happened more than three months after the protected activity was not entitled to a presumption of causation." *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) (citing cases). "'[U]nless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation.'" *Id.* (quoting *Anderson*, 181 F.3d at 1179; *see also O'Neal*, 237 F.3d at 1253.

To establish protected activity Plaintiff relies on the alleged facts that he gave a statement to Young during an investigation of allegations against Williams in September, 2005, that he verbally complained to Young about alleged discriminatory conduct by Williams before his suspension, and that he filed an internal EEO complaint before his termination.

First, as to the 2005 investigation, the undisputed facts establish that this investigation did not involve any allegation of discrimination. Further, a review of the statement that Plaintiff gave during the investigation reveals that no issue was raised of discriminatory or other unlawful conduct under Title VII or the ADEA. To engage in protected activity, an employee must communicate a complaint of unlawful conduct "because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII [or ADEA]." *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). Plaintiff presents no fact and cites no record evidence to show that he made any allegation of discrimination against Williams before he verbally complained to Young about Williams' conduct, at the earliest, in January, 2006.

The remainder of Plaintiff's asserted complaints, however, would constitute protected activities. "Protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir.2004); *see also*

*Fye*, 516 F.3d at 1228. Thus, Plaintiff's verbal complaint of discrimination to Young, if made, and his internal EEO complaint were protected. The question becomes whether Plaintiff can establish a causal link between a protected activity and his termination.

In this case, there is no evidence that Williams was aware of any verbal discrimination complaints that Plaintiff made to Young. She was informed, however, of the EEO complaint against her. Further, there is evidence that the decision maker, Beaury, was aware of both alleged protected activities. Neither of Plaintiff's complaints were in close temporal proximity to his termination. However, the record shows that decisions concerning Plaintiff's conduct and his discipline were expressly delayed because of his EEO complaint. In April, 2006, Plaintiff was advised by letter that his investigatory suspension would continue because "[c]urrently, an Internal EEO Investigation is being conducted, which is the cause of further delay." *See* Pl.'s Ex. 18 [Doc. 56-19]. The Court finds this fact to be sufficient for purposes of Plaintiff's *prima facie* burden to establish a causal link between the termination decision and Plaintiff's EEO complaint.

Therefore, the Court finds Plaintiff has come forward with sufficient facts and evidence to establish a *prima facie* case of retaliation for the purposes of Defendant's summary judgment motion.

**B.      Pretext**

Turning to the question of whether Plaintiff has presented sufficient facts and evidence to overcome Defendant's legitimate, nondiscriminatory reasons for his termination, the Court finds that Plaintiff has made a minimally sufficient showing to raise a triable issue of pretext. This issue presents a close question. The only circumstances on which Plaintiff relies to establish pretext for retaliation are doubts about Defendant's stated reasons for his termination and the "subjective

nature" of the termination decision.  *See* Pl.'s Resp. Br. [Doc. 56] at 27-28.[15]  However, courts typically infer pretext "only when the criteria on which the employers ultimately rely are entirely subjective in nature."  *See Jones v. Barnhart*, 349 F.3d 1260, 1267-68 (10th Cir. 2003); *see also Green v. New Mexico*, 420 F.3d 1189, 1195-96 (10th Cir. 2005).  The findings of misconduct underlying Plaintiff's termination did not constitute subjective criteria but involved measurable facts, such as a false time card.  Nevertheless, based on the Court's previous finding that Plaintiff has created some doubt about Defendant's stated reasons for his termination, and based on the direct connection between the investigation of Plaintiff's alleged misconduct and his EEO complaint, the Court cannot say that no reasonable juror could find Plaintiff's termination was motivated by retaliation for his discrimination complaints.

For these reasons, the Court finds that genuine disputes of material facts preclude summary judgment on Plaintiff's claim of retaliatory termination.  Therefore, Defendant is not entitled to summary judgment on his retaliation claim.

## IV.  Hostile Work Environment

Title VII and ADEA prohibit subjecting an employee to a hostile work environment.  Under either statute, the requisite proof is essentially the same:

> "For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998) (quotation omitted).  To evaluate whether a working environment is sufficiently hostile or abusive, we examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether

---

[15]  Plaintiff also relies on the alleged disparate discipline between himself and Williams.  However, for reasons stated above with regard to race discrimination (*see supra* at p. 16-17), the Court finds no inference of retaliation arising from this circumstance.

the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris v. Forklift Sys., Inc*. 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In addition, the environment must be both subjectively and objectively hostile or abusive. *Id*.; *see also Davis v. U.S. Postal Serv*., 142 F.3d 1334, 1341 (10th Cir.1998).

*MacKenzie v. City of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005); *see Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007).[16] A fact-finder must "judge the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Harsco*, 475 F.3d at 1187; *see Harris*, 510 U.S. at 21.

By its motion, Defendant asserts that Plaintiff cannot satisfy his burden to prove severe or pervasive harassment. Plaintiff's response brief is silent on this issue, and therefore, the Court in the exercise of its discretion under LCvR7.1(g) deems the issue confessed. Further, upon review of the facts presented by Plaintiff in opposition to summary judgment, the Court finds no basis for a finding that Plaintiff was subjected to severe or pervasive harassment that created an abusive working environment. Accordingly, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material facts with regard to his hostile work environment claim.

Therefore, Defendant is entitled to summary judgment on Plaintiff's claim of a hostile work environment, and Defendant's motion for summary judgment will be granted in that regard.

## V. State Law Claims

### A. Plaintiff's *Burk* claim

Defendant seeks summary judgment on Plaintiff's pendent state law tort claim based on *Burk*. Defendant argues that, because it is entitled to a judgment on Plaintiff's ADEA claim, it is

---

[16] To establish a racially hostile environment, "it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc*., 43 F.3d 545, 551 (10th Cir. 1994) (citations omitted).

also entitled to a judgment on the *Burk* public policy claim because both are based on the contention that Plaintiff's termination was motivated by age discrimination. Because the Court has concluded that Plaintiff's ADEA claim survives summary judgment, Defendant's motion must also be denied as to the *Burk* claim.[17]

### B. Plaintiff's Negligence claim

Plaintiff also asserts a claim that Defendant was negligent in supervising, training, or retaining unspecified employees, presumably, Williams. Defendant seeks summary judgment on this claim, arguing that Plaintiff has no evidence to support it. Defendant cites undisputed facts regarding its written anti-discrimination policies, internal complaint procedures, training of managers in employment practices, and involvement of HR employees in disciplinary investigations and decisions. In response, Plaintiff presents a one-paragraph factual argument: "Although [Plaintiff] does not dispute that discrimination training occurred, the fact that such training did not protect [Plaintiff] establishes the training that Williams and the others received was ineffective. . . . [Defendant] breached its duty [to protect employees from discrimination] through its failure to effectively train, supervise and retain [sic] a manager who engaged in overt discrimination." *See* Pl.'s Resp. Br. [Doc. 56] at 34.

Oklahoma has recognized a tort cause of action against an employer based on the employer's negligence in hiring, retaining, or supervising an employee who has caused harm to a third party. As the Oklahoma Supreme Court explained:

> Employers may be held liable for negligence in hiring, supervising or retaining an employee. In such instances, recovery is sought for the employer's negligence. The claim is based on an employee's harm to a third party through employment. An employer is found liable, if – at the critical time of the tortious incident – the employer had reason to believe that the person would create an undue risk of harm

---

[17]Accordingly, the Court need not address Plaintiff's contention that his ADEA and *Burk* claims are subject to different standards of proof.

> to others. Employers are held liable for their prior knowledge of the servant's
> propensity to commit the very harm for which damages are sought.

*N.H. v. Presbyterian Church (U.S.A.)*, 998 P.2d 592, 600 (Okla.1999). "The critical element for recovery is the employer's prior knowledge of the servant's propensities to create the specific danger resulting in damage." *Id.*

It is unclear whether the Oklahoma Supreme Court would recognize this type of claim in the context of harm to a co-employee rather than a third party. Other jurisdictions have not adopted such a cause of action. *See Polson v. Davis* 895 F.2d 705, 710 (10th Cir. 1990) (applying Kansas law). Assuming such a claim exists in Oklahoma, however, the Court finds that Plaintiff has failed to identify facts or evidence that could reasonably support the claim in this case.

In this case, Plaintiff has not identified the specific risk of harm at issue; presumably, the alleged danger was an act of discrimination or retaliation by Williams. However, Plaintiff has not alleged, and there is no evidence to support, facts showing that Williams had a proven history of discrimination such that Defendant should have known about the likelihood of such conduct. The employer's knowledge must have existed at the time of the alleged tortious incident. Further, Plaintiff has identified no deficiency in Defendant's anti-discrimination policies, training program, or supervision of managers' disciplinary decisions, which would support a finding that Defendant failed to take reasonable steps to prevent the alleged harm that occurred. In effect, Plaintiff seeks to infer negligence from the mere fact that an alleged act of discrimination occurred. Accordingly, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact concerning his negligence claim against Defendant.

Therefore, Defendant is entitled to summary judgment on Plaintiff's claim of negligent training, supervision, and retention.

## VI.    Punitive Damages

Finally, Defendant claims it is entitled to summary judgment on the issue of punitive damages under Title VII, and liquidated damages under the ADEA, due to Plaintiff's lack of evidence to support such damages under the applicable standards.   *See Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999); 29 U.S.C. § 626(b) (authorizing liquidated damages for a willful ADEA violation).   Defendant relies on undisputed facts regarding its written anti-discrimination policies and its efforts to disseminate and enforce those policies.   Plaintiff responds that punitive damages are available under the alleged circumstances of this case, involving intentional discrimination by a managerial level employee (Williams) with knowledge of applicable federal law.

It is unclear whether the facts on which Plaintiff relies would be sufficient to support an award of punitive damages under the heightened standard of *Kolstad*, which "bars an employer's liability for punitive damages if the manager's challenged actions were contrary to the employer's good-faith effort to comply with Title VII." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007).   However, the Court finds that it need not reach this issue because the *Kolstad* standard is inapplicable to Plaintiff's state law *Burk* claim.   This common law tort involves intentional, wrongful conduct that may permit a recovery of punitive damages under state law and its standards of "reckless disregard for the rights of others" and "malice."   *See* Okla. Stat. tit. 23, § 9.1(B)-(C). Under Oklahoma's pattern jury instructions, Plaintiff can establish "reckless disregard" for purposes of punitive damages by proving Defendant's conduct was "unreasonable under the circumstances" and there was "a high probability that the conduct would cause serious harm to another person;" Plaintiff can establish "malice" by proving Defendant "committed a wrongful act intentionally without just cause or excuse."   Okla. Uniform Jury Instructions - Civil (2nd), No. 5.5.

The court of appeals has observed that "because [a state's] punitive damages standard casts a broader net than 42 U.S.C. § 1981a(b)(1), Title VII jurisprudence ordinarily will offer no guidance

in evaluating the sufficiency of the evidence in support of a punitive damages verdict under [state] law." *Hysten v. Burlington N. Santa Fe Ry. Co*., 530 F.3d 1260, 1279 (10th Cir. 2008) (discussing the heightened *Kolstad* standard). Accordingly, due to Plaintiff's assertion in this case of a state law claim not governed by *Kolstad*, Defendant's argument is not dispositive of the issue of its potential liability for punitive damages. Therefore, the Court finds that Defendant has failed to show its entitlement to a determination as a matter of law that Plaintiff cannot recover punitive damages in this case.

## Conclusion

For these reasons, the Court finds that Defendant is entitled to a judgment as a matter of law on Plaintiff's hostile work environment claim, his claim of gender discrimination, and his pendent state law claim of negligent training, supervision, and retention. Genuine disputes of material facts preclude summary judgment on Plaintiff's claims that he was terminated based on his race, because of his age, or in retaliation for protected activity, and that he was wrongfully discharged under state law.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment [Doc. No. 51] is GRANTED in part and DENIED in part, as set forth above. The following claims remain for trial: Plaintiff's Title VII claims of race discrimination and retaliation in his termination, his ADEA claim of age discrimination in his termination, and his pendent state law *Burk* claim. Summary judgment is granted on all other claims asserted in the Amended Complaint.

IT IS SO ORDERED this __18th__ day of March, 2010.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE